IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR  23–01–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| SHELDON ANFERNEE MYKAL FISHER, | |
| Defendant. | |

Before the Court is Defendant Sheldon Anfernee Mykal Fisher's motion to suppress.  (Doc. 23.)  Defendant[1] moves this Court to suppress all evidence seized as a result of a warrantless search and seizure executed at 36374 4th Street North B, Pablo, Montana on June 1, 2022.  (*See generally* Doc. 24.)  For the reasons stated herein, the Court will grant the motion.

## FACTUAL BACKGROUND[2]

Before the Arrest and Search

At the hearing on this motion, Defendant called as a witness Tamiera

---

[1] Because one of the officers involved in the search also has the last name Fisher, this Order will refer to Defendant Fisher as "Defendant."

[2] This factual background is derived from all relevant filings and the evidence received during the suppression hearing.  To the extent any "factual issues are involved in deciding" the pending

Antone, who was in a relationship with Defendant in 2022 and shares two children with him.  She testified that in 2022, Defendant was primarily living with Ty Butler, Kayla Campos-Courchane, and Butler and Campos-Courchane's children. Antone testified that she visited the residence with Defendant and would spend about three nights per week there, and Defendant considered the residence his own. However, on cross-examination, she testified that Defendant was primarily living with his father at a different residence, but also testified that he stopped spending the night at his father's residence early in their relationship.  She testified that on May 31, 2022, she and Defendant went to the Kwa-Tuk-Nuk casino in Polson in the morning and then returned to Butler and Campos-Courchane's residence and spent the rest of the day and the following night there.  She recalled that she and Defendant slept in the bedroom that Butler and Campos-Courchane normally occupied.

At the hearing, Campos-Courchane testified that Defendant would "often" come over and would stay with her about four days of the week from December 2021 to June 2022.  She testified that Defendant left belongings such as clothing and hygiene products in a backpack kept in her downstairs closet, he showered at their house, and he would come and go when he wanted to, but she did not

---

motion, this background constitutes the Court's "essential findings" of fact.  *See* Fed. R. Crim. P. 12(d).

consider him to be "living" or "staying" there and he did not have a key to the house. She testified that he would come over at nighttime, and she, Butler, and Defendant would use methamphetamine, and then Defendant would leave the following morning. She testified that the only item he ever kept in a bedroom there was the fanny pack found on June 1, 2022.

The Arrest and Search

On the afternoon of June 1, 2022, Investigator Will Mesteth and Investigator Vernon Fisher of the Flathead Tribal Police met with a confidential informant, who told them that Defendant had met with the informant "a few minutes ago" and had given the informant fentanyl pills. The informant told the investigators that Defendant had a black fanny pack in his possession, in which the informant had seen a large bag full of fentanyl and a pistol. The informant also told the investigators that Defendant had gone to another individual's residence after meeting with the informant and planned to go to Ty Butler's residence.

The investigators were aware of a warrant for Defendant's arrest that had been issued by the Tribal Court on February 28, 2022 because Defendant failed to appear in the Tribal Court. That case related to a criminal complaint filed against Defendant on April 28, 2020, charging Defendant with driving while his license was suspended or revoked, operating a vehicle without proof of liability insurance, and operating a vehicle without wearing a properly adjusted and fastened seatbelt

on October 20, 2019.  It is undisputed that the investigators did *not* have a search

warrant.  Within about ten minutes of receiving the informant's report, Investigator

Mesteth and Fisher drove to an area from which they could observe the entrances

to both of the residences Defendant reportedly planned to visit.  Investigator Fisher

observed Defendant walking toward Butler and Campos-Courchane's residence

and carrying a black fanny pack, at which point Defendant saw them, got on a

bicycle, and went around a building; the investigators then saw the bicycle by the

back door of the Butler and Campos-Courchane residence.  Investigator Fisher

ordered a Tribal Officer to watch the back door of the residence, and the

investigators went to the front door.

According to body camera footage provided by the United States,

Investigator Mesteth knocked on the door, and Campos-Courchane answered.

Investigator Mesteth said, "We're here for Sheldon."  Campos-Courchane replied,

"Sheldon?  All right, hold on," and began to close the door.  Investigator Mesteth

told her to tell Defendant that he needed to come outside or he would "come grab

him," and he instructed Campos-Courchane to leave the door open.  Campos-

Courchane complied and stated, "Don't let my kid out, please."  The investigators

remained in the open doorway.  Less than 20 seconds later, Investigator Mesteth

saw Defendant inside the house and shouted, "Let me see your hands, man."

Defendant complied and came to the doorway with his hands up.  Investigator

Mesteth said, "We got a warrant," and reached behind his back for handcuffs. Defendant asked what the warrant was for and asked to see it.  Investigator Mesteth said it was a tribal warrant and continued handcuffing Defendant. Defendant protested that he had gotten the warrant quashed as Investigator Mesteth patted him down.  Investigator Mesteth offered to "call and check" about the arrest warrant and led Defendant away from the doorway and toward a nearby waiting patrol car, where two Tribal Officers were waiting.  As they walked, Investigator Mesteth asked Defendant about the black bag, and Defendant stated that it was not his.  Investigator Mesteth asked whose it was, and Defendant did not respond. Investigator Mesteth said, "You don't want to talk about it, huh?  About to go in there and get it.  You don't want to talk about it now?"  Defendant continued to deny that the bag was his, although he tacitly acknowledged that he was carrying it earlier after Investigator Mesteth said he saw Defendant with the bag by responding, "That doesn't mean it's mine."  He denied stealing it and said he did not know whose it was.  Investigator Mesteth told the other Tribal Officers, "You guys got this guy.  I'm gonna go get his bag."

As Defendant was led away from the house, Investigator Fisher remained just outside the doorway as Campos-Courchane returned to the door.  Investigator Fisher told Campos-Courchane, "We know he carried a backpack in here."  She stated that she did not see him with one.  Investigator Fisher said it was a black

backpack, and Campos-Courchane replied, "Okay, hold on.  I'll go talk to Ty about it."  As she backed away from the door, Investigator Fisher asked, "Can I come in?"  Campos-Courchane replied, "Yeah, stay right there though, please," as Investigator Fisher stepped through the doorway.  Investigator Fisher did not stay in the entryway, but rather followed Campos-Courchane to the bottom of the stairway in her house leading to the second floor, which she walked up. Investigator Fisher continued moving into the house and toward the stairway. About 40 seconds after he entered the house, he called upstairs, "Hey, Ty," and after Butler responded, "Yep," Investigator Fisher said, "C'mere."  Campos-Courchane and Butler came downstairs as Butler asked what kind of backpack Defendant had, and Investigator Fisher said it was a black fanny pack that was "supposed to have a gun and fentanyl in it, so…"  Butler responded, "It is?" as Investigator Fisher said "so you guys don't want none of that trouble."  Campos-Courchane said she had just woken up and had not seen anything.  Butler said Defendant came in the back door and went upstairs.  Investigator Fisher asked if Defendant had thrown the bag anywhere, and Butler said he didn't know.

Although the following events are described in specific detail, the Court emphasizes that everything described in the following paragraph took place quickly, over the course of 45 seconds.  Investigator Fisher asked, "Can we look around real quick?"  Butler walked away toward the children in the living room,

6

and Campos-Courchane said, "Um…" before Investigator Fisher said, "I got a couple choices, you know. Either look around, or—. . ." At this moment, Investigator Mesteth had returned to the house and walked in, standing behind Investigator Fisher. Campos-Courchane interrupted Investigator Fisher, saying, "Okay, I'll go," as she started to walk up the stairs. Investigator Mesteth said, "You gonna go with her?" and Investigator Fisher replied, "Yeah," as he was already following Campos-Courchane up the stairs. As Campos-Courchane reached a turn in the stairway, she saw Investigator Fisher following her and said, "No, no, no. I'll grab it. I'll grab it." Investigator Mesteth called out, "He's gotta go with you." Investigator Fisher added, "It's supposed to have a gun in it," and continued following her. Campos-Courchane entered the room at the top of the stairs, and Investigator Fisher followed her and stood in the doorway as she pulled a black fanny pack from a bed, underneath the mattress. As she handed it to Investigator Fisher, she said, "You guys gonna report this to housing or anything? Please don't. Because I mean—I didn't—I was sleeping, I didn't know he was in here." Investigator Fisher asked, "How did you know it was under the bed?" Campos-Courchane replied, "Because Ty just showed me it." Investigator Fisher began walking downstairs and said he would talk to them there "because you don't want none of that trouble, you know?" Campos-Courchane said, "Yeah, that's why I gave it to you, because I don't want none of that trouble," and followed him.

7

Downstairs Investigator Mesteth was explaining to Butler their observation of Defendant and said he was "trying to make sure [Defendant] didn't leave none of that in your house; it would suck for us to have to do a search warrant on it." Investigator Fisher arrived downstairs and said, "You knew it was under the bed, Ty." Butler admitted he saw Defendant with the bag. Investigator Mesteth said that Defendant was denying that the bag was his, and Butler and Campos-Courchane denied that the bag was theirs. As the conversation went on, Butler admitted that he saw Defendant come in with the bag, and Defendant "asked me if I could put it somewhere, and I told him—I was like—I can't hide nothing, you know?" Butler denied putting the fanny pack under the bed. Investigator Fisher said, "It's gonna be a federal amount of fentanyl in here. You got enough trouble," and asked them to be truthful. Campos-Courchane, sounding frustrated, told Butler to be truthful. Butler eventually admitted he knew Defendant had put the bag under the bed but denied telling Defendant to put it there. The investigators then told Butler and Campos-Courchane that they were "good" and left the residence.

Back at the patrol car, a Tribal Officer provided Defendant a Miranda warning. Investigator Fisher brought the fanny pack to Defendant and asked him what was in the bag, telling him to be honest because "I can feel what's in the bag. You got some fentanyl in there?" After a long pause, Defendant quietly said,

"Yeah."  Defendant shrugged when asked how many pills were in the bag, but when Investigator Fisher asked whether there were a thousand pills, Defendant said, "About."  Investigator Fisher asked whether there was a gun in the bag, and Defendant said, "Yeah."  Defendant said he did not know what kind of gun it was. Investigator Fisher asked if it was okay "if I open it up and look?"  Defendant turned his head away and did not respond.  Investigator Fisher suggested that Defendant could "get ahead of [his] trouble" by consenting, but when Investigator Fisher asked again for consent to search, Defendant said no.  Investigator Fisher said he would seize the bag based on Defendant's admission that it contained fentanyl, and Defendant would be taken to jail on the arrest warrant.  Investigator Fisher walked to Investigator Mesteth and stated that Defendant admitted that there were about a thousand fentanyl pills and a gun in the bag but did not consent to Investigator Fisher opening it, so he would get a search warrant.  Shortly afterward, Investigator Mesteth's video concluded.  Investigator Fisher's video concluded shortly after Investigator Fisher placed the fanny pack in a truck and got into the driver's seat.

<u>After the Arrest and Search</u>

Later on June 1, 2022, Investigator Fisher applied for and received a search warrant for the fanny pack.  (Doc. 24-4.)  As relevant here, the fanny pack contained 187.6 grams of fentanyl, a Taurus 9MM pistol, and ammunition.  (Doc.

24-5.)

As a result of Defendant's arrest, Campos-Courchane was evicted from the house in Pablo.  While she was living in Dixon, Special Agent Moffet visited her and asked her questions about Defendant.  She told him that Defendant was not on the lease at the Pablo house and never stayed there.  At the hearing, she testified that she told Agent Moffet that because she did not understand the context of his questions, and she was afraid to admit to him that Defendant was at her residence so much because of her conversation with Investigator Fisher about the "federal" amount of drugs in the fanny pack.

### PROCEDURAL BACKGROUND

On January 5, 2023, Defendant was indicted on one count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1), one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and one count of prohibited person in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(3).  (Doc. 2.)  Defendant subsequently filed the instant suppression motion.  (Doc. 23.)  The Court held a hearing on May 17, 2023.  (Doc. 32.)  Having reviewed the evidence and arguments submitted in this matter, the Court finds Defendant's Fourth Amendment rights were violated, and, as such suppression of the evidence procured by the warrantless search of Campos-Courchane's residence, including

the fanny pack and its contents, is proper.

ANALYSIS

Fisher contends that he has standing to challenge the search because, as an overnight guest at Campos-Courchane's residence, he had a reasonable expectation of privacy within the residence and the room where the fanny pack was found. (Doc. 24 at 2, 9–12.)  He further argues that a warrantless search was not justified because the search was not incident to his arrest, it was not consensual, and there were no exigent circumstances.  (*Id.* at 3, 12–20.)  Finally, he argues that the investigators used Campos-Courchane as an instrument or agent of the government to conduct the search.  (*Id.* at 3, 20–24.)  The Court agrees.

## I.    Defendant has Fourth Amendment standing as an overnight guest in the residence.

A party seeking to suppress evidence obtained in violation of the Fourth Amendment must demonstrate that he has a legitimate expectation of privacy in the invaded place.  *Minnesota v. Olson*, 495 U.S. 91, 95–96 (1990).  A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable.  *Id.*  The Supreme Court has held that a person's status as an overnight guest is sufficient to show a legitimate expectation of privacy in his host's home.  *Id.* at 96.  However, someone who is merely "legitimately on the premises" or who presents no evidence that he was temporarily staying at the

11

premises does not demonstrate a legitimate expectation of privacy. *United States v. Armenta*, 69 F.3d 304, 308–09 (9th Cir. 1995).

In its briefing, the United States points to Campos-Courchane's inconsistent statements regarding whether Defendant was staying at the residence and Butler's statement to the investigators that Defendant asked him if he could put the fanny pack somewhere as indicating that Defendant was merely a casual visitor who felt the need to ask permission to keep belongings at the residence.  (Doc. 26 at 8–9.) The Court views these facts differently.  Both Antone and Campos-Courchane testified that Fisher regularly spent roughly half of any given week at Campos-Courchane's residence around the time of the search, and Campos-Courchane's early denials that Defendant stayed with her are reasonably explained by her fears of being evicted from tribal housing for having unauthorized guests and potentially facing criminal consequences because the fanny pack was found in her residence. Additionally, based on its context in the body camera footage, the Court understood Butler's statement about Defendant's request to put the fanny pack somewhere as seeking Butler's help in hiding the fanny pack after Defendant spotted the investigators, which Butler refused to do, rather than seeking permission to leave his belongings in the house.  Although there were inconsistencies and memory lapses in the witnesses' testimony in some respects, their testimony was persuasive concerning Defendant regularly spending days and

12

nights at Campos-Courchane's residence and, in particular, spending the night at the residence the night before the search occurred.

At the hearing, the United States distinguished the factual circumstances presented in this case from those in *Olson* because Campos-Courchane testified that Defendant would come to the residence to use drugs and would sometimes "pass out" in various areas of the house, as distinguished from sleeping, and Defendant had no expectation of privacy in the bedroom where the fanny pack was located because he did not keep any personal items in the bedroom. The United States warned that characterizing Defendant's use of the residence as that of an overnight guest could lead to a slippery slope in which defendants assert a reasonable expectation of privacy in "flop houses" where they use drugs or hide contraband. Although the sleeping arrangements described in the witnesses' testimony may seem unusual, the Court is disinclined to limit an overnight guest's reasonable expectation of privacy to a prototypical spare bedroom, where all of the guest's belongings are neatly stored and residents do not enter without knocking, or to craft legal distinctions between two descriptions of states of unconsciousness. This inquiry of a defendant's standing to contest the legality of a search is a mixed question of law and fact, *Armenta*, 69 F.3d at 306–07, and on the facts of this particular case, the Court finds that the household's residents and regular guests alike made use of various areas of the entire house for socializing, sleeping, and

13

storage, likely due in no small part to the regular presence of four adults and four children in a small three-bedroom home.  Although Defendant did not regularly store his belongings in Campos-Courchane's bedroom, he did regularly stay overnight in that room with his then-girlfriend, including on the night before the search in question.  The Court finds this case similar to *United States v. Jeffers*, 342 U.S. 48 (1951), in which the Supreme Court held that a person regularly staying at a hotel room registered to another person had standing to challenge an unconstitutional search and seizure therein, even though he was using the hotel room to store narcotics.  *Id.* at 52.  The fact that Defendant's stays at the residence frequently involved drug use and sometimes entailed "passing out" on a couch does not destroy his reasonable expectation of privacy as an overnight guest; to hold that it does could create a much slipperier slope on which officers conducting unconstitutional searches could retroactively justify their intrusions based upon occupants' history of bad behavior conducted within the privacy of the home. Whether a guest falls asleep at 9:30 p.m. in a cozy and private guest bedroom or "passes out" on a friend's couch after using methamphetamine, drinking one too many glasses of wine, or playing video games until 4 a.m., the Supreme Court's rationale in *Olson*—that the overnight guest seeks privacy and safety in another's home rather than staying out on the street, and reasonably expects that "he and his possessions will not be disturbed by anyone but his host and those his host allows

inside"—can apply. *Olson*, 495 U.S. at 99.

Accordingly, the Court finds that Defendant was an overnight guest at Campos-Courchane's residence the day the search occurred, and he has standing to challenge the search of that residence under the Fourth Amendment. *Olson*, 495 U.S. at 96–100.

## II.   The search was not conducted pursuant to a warrant, and no exceptions to the warrant requirement are applicable.

It is conceded here that the government did not have a search warrant. "[S]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  The burden is on the government to prove that an exception applies. *Id.* at 455.

In this case, the United States primarily argues that the investigators received Campos-Courchane's consent to retrieve the fanny pack.  (Doc. 26 at 10–12.)  "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  When the government seeks to rely upon consent to justify a warrantless search, the prosecutor has the

burden of proving that consent was freely and voluntarily given. *Id.* at 222. "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Both the "Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.* at 228.

The Court finds that, under the totality of the factual circumstances in this case, Campos-Courchane's consent to search was not voluntarily given. From the beginning of her interaction with the investigators, Investigator Mesteth refused to allow her to close the front door after she opened it, and he said he would "come grab" Defendant if he did not come outside. After Defendant was handcuffed and taken to the patrol car, Investigator Fisher remained in the open doorway and asked Campos-Courchane about a backpack as soon as she returned to the door. She again tried to leave the doorway and said she wanted to speak with Butler about it, but Investigator Fisher asked to come inside. Although Campos-Courchane said he could, she asked him to "stay right there"—but he did not. He waited for less than a minute at the bottom of the stairs before calling up to Butler, and then he

told Butler and Campos-Courchane that the fanny pack was "supposed to have a gun and fentanyl in it" and "you guys don't want none of that trouble." Within seconds of saying that, he asked whether "we"—the investigators—could "look around." As Campos-Courchane paused, Investigator Mesteth re-entered the residence, and Investigator Fisher began to say, "I got a couple choices, you know. Either look around, or—" And only then did Campos-Courchane say, "Okay, I'll go" and turn upstairs. She protested, to no avail, when Investigator Fisher followed her. As she handed the bag to him, she pleaded with him not to tell the housing authority what had happened. And as they returned downstairs, Investigator Fisher reiterated that she and Butler did not "want none of that trouble," and Campos-Courchane said that was the reason she gave him the bag. In the Court's view, from the moment the investigators arrived, they asserted their authority to enter the house to arrest Defendant and refused to allow Campos-Courchane to close the door. Defendant was arrested in Campos-Courchane's doorway and led away, but Investigator Fisher remained behind, disregarded Campos-Courchane's request that he remain in the entryway when he entered the house, and informed Butler and Campos-Courchane that the bag was supposed to contain fentanyl and a gun and implied they would be in "trouble." Even after Investigator Mesteth had accomplished what he told Campos-Courchane he was there to do in arresting Defendant, he returned to and entered the house. The

message was clear:  The investigators had control over what could and could not

happen in the house in that moment, they were not leaving without the bag, and

"trouble" loomed for Butler and Campos-Courchane—all while two of their young

children played in the room adjacent to the stairway.  And, less than one minute

later, Campos-Courchane confirmed that she had relented to avoid "trouble."  The

totality of the circumstances indicates that her consent was obtained only after the

implicit threat of "trouble," explicit assertion of authority to enter the home to

"grab" Defendant at the outset of the interaction, and implicit assertions of

authority over the home by Investigator Fisher requesting to enter and ignoring her

requests to stay put and by Investigator Mesteth reentering the home after

Defendant had been detained; together, these factors lead the Court to conclude

that Campos-Courchane's consent was not voluntary.  *See Bustamonte*, 412 U.S. at

233 ("[I]f under all the circumstances it has appeared that the consent was not

given voluntarily—that it was coerced by threats or force, or granted only in

submission to a claim of lawful authority—then we have found the consent invalid

and the search unreasonable.").  Accordingly, the consent exception to the warrant

requirement does not apply in this case.

   Alternatively, the United States contends that exigent circumstances justified

a warrantless search because the investigators had probable cause to believe that

the fanny pack contained fentanyl and a gun, they observed Defendant with the

18

fanny pack shortly before he entered the residence, and the investigators were concerned for the safety of the children in the household and for possible destruction of evidence because Butler had previously admitted to disposing of a gun used in a homicide that occurred in 2018.  (Doc. 26 at 14–16.)

The Supreme Court has held that exigencies permitting officers to make a warrantless entry into private property include preventing the imminent destruction of evidence, engaging in hot pursuit of a fleeing suspect, rendering emergency assistance to an injured occupant, or protecting an occupant from imminent injury. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *see also United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010) (same).  "[A]n officer's subjective motivation for his actions is irrelevant in determining whether his actions are reasonable under the Fourth Amendment."  *Struckman*, 603 F.3d at 744.

At the hearing, Investigator Mesteth testified that he could have gotten a search warrant, but "didn't because they acknowledged the bag was there and they went to go get it."  He described the procedure for obtaining a search warrant after business hours, when this search took place: drafting the warrant and finding a judge in-person to review it.  He testified that, generally, he would be able to reach either of the Lake County District Judges to have them review a warrant outside of business hours.  He acknowledged that he "could have" seized the house, cleared the occupants out, and waited for a warrant to search the residence.  He also

19

testified that there were no circumstances that existed that prevented him from applying for a warrant.

Investigator Fisher testified that if Campos-Courchane had not given him the bag, he would have applied for a search warrant, but he did not want to do so because he would "have to displace Ty, the four kids, and her while I got the search warrant." On cross-examination, he acknowledged that he could have removed the children, Campos-Courchane, and Butler from the residence while waiting for a warrant, and then there would have no possibility of any of the occupants "getting into" the fentanyl or the gun.

Under these facts, the government has not met its "burden of showing specific and articulable facts to justify the finding of exigent circumstances." *Struckman*, 603 F.3d at 743. It is objectively reasonable to have serious safety concerns about fentanyl, a particularly deadly drug even in small doses, being present in a house with young children. Likewise, it was objectively reasonable for the investigators to be concerned about Butler potentially disposing of evidence of a crime because of his involvement in a previous serious instance of disposing of evidence. However, the investigators' actions, which amounted to a warrantless search and seizure, were not necessitated by or reasonable under the totality of the circumstances, particularly in light of the other options available to them at the time.

20

The United States relies heavily on an Eighth Circuit case, *United States v. Antwine*, 873 F.2d 1144 (8th Cir. 1989), in which an officer made warrantless entry into a defendant's home after the defendant had been arrested to seize a handgun the defendant had brandished at officers, because officers discovered two young children were home and—inexplicably—planned to leave those children alone and unsupervised, but decided to remove the handgun for their safety. The district court found that exigent circumstances justified the limited entry and seizure based on the children's safety and lack of other options available to the officer at the time, and the court of appeals concluded that those findings were not clearly erroneous. *Id.* at 1147. Here, by contrast, two adults were in the home with the children. Although both adults feigned ignorance about the fanny pack's whereabouts at first, they largely cooperated with the investigators' requests, and there is no evidence that they were aware of the fanny pack's contents at the time of the search. There is no indication that the family would have refused to vacate the house while the investigators obtained a warrant. The timing was after business hours, but still early on a sunny evening in June; displacing the family from the home for a few hours would not have necessitated a middle-of-the-night hotel stay or sitting in a running car for warmth in the depth of winter. Although the investigators' subjective testimony that they were not prevented from obtaining a warrant are legally irrelevant to the inquiry, they confirm the objective reality of

21

the situation:  In this case, there was no exigency sufficient to dispose of the warrant requirement to search for and seize the fanny pack.

Because no exception to the warrant requirement applies in this case, the Court concludes that the search for and seizure of the fanny pack was unconstitutional—if it was performed by the government.

## III.    Campos-Courchane was acting as an instrument or agent of the government when she retrieved the fanny pack.

The United States argues that no search occurred in this case because the government did not intrude on any private areas, but rather, Campos-Courchane conducted the search.  (Doc. 26 at 9–10.)  "[T]here is no seizure within the meaning of the fourth amendment when objects discovered in a private search are voluntarily relinquished to the government."  *United States v. Sherwin*, 539 F.2d 1, 8 (9th Cir. 1976).  But "a private search still may implicate the Fourth Amendment if there is a 'sufficiently close nexus' between the government and the private entity's challenged conduct."  *United States v. Rosenow*, 33 F.4th 529, 541 (9th Cir. 2022).  "The Fourth Amendment does prohibit unreasonable intrusions by private individuals who are acting as government instruments or agents."  *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994).  The Ninth Circuit "has recognized that there exists a 'gray area' between the extremes of overt governmental participation in a search and the complete absence of such

participation." *Id.*  In those cases, the court "must inquire: '(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends.'" *Id.* (quoting *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)).

The Court's findings and facts discussed above concerning the voluntariness of Campos-Courchane's consent to the search are sufficient for the Court to conclude that this case falls outside the "gray area," and there was overt governmental participation in the search.  Campos-Courchane went to retrieve the fanny pack only after both investigators were inside her home and Investigator Fisher alluded to "trouble" seconds before asking if they could look around, and the investigators both rebuffed her request that they stay downstairs while she retrieved it.  Investigator Fisher followed her and stood in the doorway of the bedroom while she removed the fanny pack from under the mattress, and she handed it directly to him while pleading with him to not report the incident to the housing authority.  Even if his supervision stemmed from a concern for officer safety in light of the information they had received that the fanny pack contained a firearm, he was directly involved with the search and seizure.

Even if the facts of this case fell within the "gray area," the Court finds that the test set forth in *Reed* is amply satisfied.  The *Reed* court found the first factor

satisfied where the officers "were personally present during the search, knew exactly what [the private party] was doing as he was doing it, and made no attempt to discourage him from examining Reed's personal belongings beyond what was required" to satisfy the private party's concern motivating the intrusion, which was protecting hotel property and ensuring that the hotel room was clean and in good condition.  15 F.3d at 930–31.  Here, the investigators likewise were personally present in the house and Investigator Fisher followed Campos-Courchane up to the bedroom and watched her retrieve the fanny pack, and Campos-Courchane's search and surrender of the fanny pack took place immediately after Investigator Fisher requested consent to search the residence.  The second factor is also satisfied as it was in *Reed*, because Campos-Courchane's motive in retrieving the fanny pack was to help the officers gather evidence of a crime.  15 F.3d at 931–32. To be sure, in *Reed*, the hotel manager's subjective motives included looking for evidence of drug dealing and providing that evidence to the police because he believed he could lawfully do so without a warrant; he had direct, express intent to assist law enforcement.  *Id.* at 931.  Here, Campos-Courchane was subjectively concerned with avoiding negative consequences for herself and her family if contraband was discovered in the house after a search rather than aiding law enforcement as a goal in itself, but in order to avoid the "trouble" Investigator Fisher alluded to, she felt she had to retrieve the fanny pack for him.  The Court

concludes that, unlike a corporation's financial interest in preventing theft or avoiding a crime-friendly reputation, *see Rosenow*, 33 F.4th at 544, Campos-Courchane's subjective motive to avoid her own potential liability for a criminal act was not independent of a motive to assist law enforcement in gathering evidence of that criminal act in retrieving the fanny pack.

Accordingly, the Court concludes that although Campos-Courchane retrieved the fanny pack and surrendered it to Investigator Fisher, she did so as an agent or instrument of the government. And even if her conduct fell within the gray area between overt government involvement and a total absence of government participation, the investigators in this case were so closely involved with the search, and her motive was so intertwined with assisting law enforcement, that the *Reed* test is satisfied, and the Fourth Amendment is implicated.

## ORDER

In sum, Defendant has standing to raise this Fourth Amendment challenge because he was an overnight guest in the residence; the warrantless search and seizure were not performed pursuant to voluntary consent or exigent circumstances, and they were therefore unreasonable; and Campos-Courchane was acting as an agent of the government when she retrieved the fanny pack and gave it to Investigator Fisher. The warrantless search for, and seizure of, the fanny pack violated Defendant's Fourth Amendment rights.

IT IS ORDERED that Defendant's motion to suppress (Doc. 23) is GRANTED.

IT IS FURTHER ORDERED that all evidence procured by virtue of the unconstitutional search and seizure, including the fanny pack and all items contained therein, is SUPPRESSED, consistent with this Order.

IT IS FURTHER ORDERED the United States shall file a notice on or before June 9, 2023, regarding its intent to proceed to trial, dismiss the Indictment, or pursue an appeal, so that this Court determine whether it needs to issue a new scheduling order in conformance with the Speedy Trial Act.

DATED this 1st day of June, 2023.


_____
Dana L. Christensen, District Judge
United States District Court

26